# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| OJI DIXON, #991805302 | * |
| Plaintiff | * |
| v. | *  Civil Action Case No. AW-09-3320 |
| CMS | * |
| Defendant | * |

## MEMORANDUM

Pending is plaintiff pro se Oji Dixon's prisoner civil rights complaint pursuant to 42 U.S.C. § 1983 alleging that he was denied adequate medical treatment while a detainee at the Baltimore City Detention Center (BCDC).[1] Counsel for Correctional Medical Services, Inc. (CMS) has filed a Motion to Dismiss or Alternatively a Motion for Summary Judgment to which Dixon has replied. Defendant's Motion shall be reviewed as one for summary judgment. After review of the pleadings, record, and applicable law, the court determines a hearing is not necessary, s*ee* Local Rule 105.6 (Md. 2010), and summary judgment shall be entered in favor of Defendant.

## I. Background

Dixon claims that during the time he was housed at BCDC he was denied treatment for hypertension, nerve damage to his right leg, bowel problems, and bleeding from the mouth and penis. The relief he requests is medical treatment for his conditions.

In support of the dispositive motion, counsel for CMS has filed verified copies of Dixon's medical records which demonstrate that he has a history of peptic ulcer disease (PUD),

---

[1] Dixon is currently housed at the Jessup Pre-Release Unit. *See* http://www.dpscs.state.md.us/inmate/.

hypertension (HTN) and a gunshot wound to his right buttock. Dixon was incarcerated in the Baltimore City Booking and Intake Facility on May 1, 2008. ECF No. 8, Exhibit A, ¶ 3 Exhibit B, p. 1.

   **1. Treatment for Hypertension**

On May 5 and 6, 2008, Dixon filed Sick Call Request Forms complaining that he had not received his hypertension medicine. On May 8, 2008, a nurse evaluated Dixon and recorded elevated blood pressure at 168/91. The nurse referred Dixon to a physician assistant for additional evaluation and to prescribe HTN medication. Francis Oluwo, P.A. prescribed hydrochlorothiaszide (HCTZ) once a day for Dixon's hypertension and scheduled him for an appointment in the Chronic Care Clinic for one week later to adjust the medication as needed. Exhibit A, ¶ 4; Exhibit B, pp. 1-12, 105. On May 16, 2008, Dolph Druckman, M.D. prescribed 20 mg of Lisinopril to Dixon's daily medications to treat his hypertension. Exhibit A, ¶ 5; Exhibit B, pp. 13-14, 106-107.

On June 6, 2008, Dixon was transferred to the BCDC. From Late July to mid-August 2008, Dixon's blood pressure remained elevated. On August 18, 2008, a correctional officer brought Dixon's blister pack medications to Leora Taylor, R.N. who noted that Dixon was not taking his prescribed medications. As a result, Dixon was placed on "watch take" status for the administration of his medications.[2]

On January 7, 2009, Dixon's blood pressure was recorded as normal at the Chronic Care Clinic, measuring 117/67. On March 7, 2009, Dixon's blood pressure was 90/60, which is

---

[2] "Watch take" status requires the inmate to come to the pharmacy or his medications are delivered to his cell. The inmate may not keep the medications in his cell. ECF No. 8, Exhibit A. n. 1.

slightly low. Exhibit A, ¶ 7; Exhibit B, pp. 68, 76-77. The medical staff in the Chronic Care Clinic continued to monitor Dixon's high blood pressure.

In July of 2009, Dixon was permitted to keep Lisinopril in his cell and take it as prescribed. Plaintiff's blood pressure continued to fluctuate. Exhibit A, ¶ 8. Exhibit B, pp. 79, 83, 87, 92, 94, 102-103, 126-129.

2. **Treatment for Digestive and Bowel Complaints**.

Upon incarceration at the Baltimore City Booking and Intake Facility, Dixon informed the examining nurse of his history of ulcers and that he was taking the medications Zantac and Prilosec.[3] Dixton was prescribed Zantac and Pepto-bismal while he was incarcerated at the BCDC. Dixon's complaints of constipation were treated with Dulcolax, a stool softener and Matamucil, a fiber laxative. Exhibit A, ¶ 9.

Dixon continued to complain of stomach problems and changes in his bowel habits. On June 18, 2008, Dr. Druckman examined Dixon, diagnosing irritable bowel syndrome. Dr. Druckman renewed Dixon's prescriptions for Dulcolax and Metamucil. Exhibit A, ¶ 10. Dixon continued to complain of an ulcer, constipation, and stomach bleeding. He was advised to continue with the Metamucil and to increase fiber and fluid intake.

On September 12, 2008, an x-ray showed that Dixon had a moderate fecal impaction. He was prescribed Lactulose, a laxative. He was also given Mintox or Maalox (antacids) for his complaints of indigestion. Exhibit A, ¶ 11. On January 8, 2009, Mohammad Saleem, M.D. prescribed Milk of Magnesia for Dixon's constipation. On March 10, 2009, Lactulose was prescribed for one month. After Dixon complained that Zantac did not help his ulcer or stomach

---

[3] Zantac is a medication for reducing stomach acid. Prilosec is a medication for treating heartburn and is recommended for short term use. ECF No. 8, Exhibit A, nn. 2 and 3.

pain, his medication was changed to Prevacid on February 20, 2009 for one month. On March 7, 2009, Dixon's Zantac was restarted. Exhibit A, ¶¶ 12-13.

### 3. Treatment for Complaints of Bleeding

Dixon complained there was blood in his urine on October 9, 2008. Olunatoyin Abiodun, RN, examined Dixon. Dixon's urine specimen tested negative for blood, although a small dried clot of blood was noted at the bottom of the specimen container. When advised of the test results, Dixon became "severely agitated" and left the Dispensary. Exhibit A, ¶ 14; Exhibit B, pp. 62-63.

On October 24, 2008, Lisa Marcinko, a physician's assistant, examined Dixon and ordered an x-ray of his kidney, ureters, and bladder. The x-ray showed no abnormalities of the kidneys or pubic region. Exhibit B, pp. 64-65. Dixon presented no additional complaints of bleeding until November 11, 2009, when he filed a Sick Call Request Form for bleeding genitals. Counsel for Defendant indicates the Sick Call Request Form was received on November 13, 2009. Dixon also filed a Sick Call Request Form on November 13, 2009 regarding genital bleeding. Dixon was scheduled for a November 17, 2009, clinic appointment. He was unable to be seen on November 13, 2009 because of scheduling conflicts. Exhibit A, ¶ 16.

Dixon offered no further complaints about bleeding until January 6, 2010, when he filed a Sick Call Request Form for penile bleeding. On January 8, 2010, Cletus Agha, RN tested a urine sample provided by Dixon. The results were negative for blood. On January 9, 2010, Shana Subram, a physician's assistant explained to Dixon that the test revealed no blood in his urine. Dixon indicated that he understood that his urine tested negative for blood.

### 4. Treatment for Conditions Resulting from Gunshot Wound to Buttock

In 2004, Dixon suffered a gunshot wound to his right buttock. At intake on May 8, 2008, Dixon exhibited an altered gait, decreased sensation in his right leg, and an inability to flex his ankle, but voiced no complaint of pain. Exhibit A, ¶ 18; Exhibit B. pp. 7-11. On June 3 and 4, 2008, Dixon filed a Sick Call Request Form complaining of lack of sensation in his right leg, difficulty walking, and requested medical treatment for his leg. On June 9, 2008, Donna Thompson, RN observed that Dixon was able to ambulate without much difficulty. Exhibit A, ¶ 19; Exhibit B, 19-22.

On June 18, 2008, Dr. Druckman examined Dixon. The medical chart shows that Dr. Druckman observed a healed gunshot wound of the right buttock, slightly reduced muscle mass of the right buttock with mildly reduced tone, reduced muscle strength of the right lower extremities compared to the left, tenderness at the right siatic notch, and a mild foot drop. Exhibit B, p. 24. He determined: "[T]here are physical findings c/w neuromuscular impairment of both the anal spincter and lower extremity function." Exhibit B, p. 24. Dixon was prescribed Neurontin, a medication for nerve pain, assigned to a bottom bunk on a medical floor and provided a cane. It was noted on the chart that Dixon had previously been followed by a neurosurgeon at Sinai Hospital in Baltimore. Dr. Druckman wrote that he would initiate the "consult process to evaluate current status." Exhibit B, pp. 24, 27.

On July 8, 2008, Lisa Marcinko, PA wrote a progress note that Dixon needed a refill of Neurontin. She questioned whether the neurosurgery consultation had occurred and would reprint and resubmit the request to the Chronic Care Clinic. Exhibit B, p. 32.

On July 30, 2008, Dixon was examined by Glory Inwang, RN. She noted that Dixon was "unable to ambulate and hunched over even while in a sitting position…." Exhibit No. B, p. 38. She referred him for an appointment with a physician. On August 1, 2008, Dixon's lumber

spine was x-rayed. The x-ray showed bullet fragments embedded in his right pelvis. There was no other lumbar abnormality. Exhibit A, ¶ 21; Exhibit B, p. 39.

On January 7, 2009, Dr. Saleem examined Dixon for his continuing complaints of right leg and buttock pain. Examination showed that the inner upper quadrant of Dixon's buttock was mildly tender. Dr. Saleem recommended warm moist compresses to the right hip and Tylenol for pain. Exhibit B, pp. 49-51, 58, 60, 67-73, 75. On March 7, 2009, Gregory Taylor, M.D. saw Dixon for his complaints of buttock pain and numbness in the foot. Dixon told Dr. Taylor that it was his understanding that the bullet in his hip was inoperable. Dixon said he wanted something done about the bullet because he could feel it when he sat down. Dr. Taylor noted that he would look into an orthopedic surgery consultation for Dixon. Dixon refused Neurontin and Elavil to treat his pain. Exhibit A, ¶ 23; Exhibit B, p. 76. Dixon continued to complain about his hip and leg.

On July 22, 2009, Dixon went to the medical unit and stated that he wanted the bullet removed from his buttock. Dixon told Lisa Marcinko, PA, that when he first sustained the gunshot wound the hospital had informed him that he would need surgery. She noted that Dixon was not using any assistive devices at the time for walking. She observed no neurological nor musculoseletal deficits had been noted at Dixon's Chronic Care Clinic appointment on July 17, 2009. Exhibit A, ¶ 24.

On August 4, 2009, Nurse Thompson evaluated Dixon for complaints of pain in his right hip. Plaintiff estimated the pain at 10 out 10, with 10 being the worst possible pain. Nurse Thompson recorded in the medical record that Dixon was limping and showed signs of discomfort when ambulating. Nurse Thompson provided Dixon with Motrin for pain and scheduled him to see the physician assistant. Exhibit A, ¶ 25; Exhibit B, pp. 87-88. On August 5,

2009, an x-ray of Dixon's right hip was taken. The x-ray revealed a large bullet lodged in the roof (top) of the acetabulum with new bone surrounding it.[4]

On October 1, 2009, Dixon told Dr. Saleem that he had constant pain from the gunshot wound and requested a "donut," a special pillow used to sit with less pressure on the coccyx (tailbone) and lessen pain. Dr. Saleem ordered the "donut" and an orthopedic consultation for Dixon. Dr. Saleem observed Dixon had atrophy of his right button and tenderness in the area. Dixon's extremities appeared normal. Exhibit A, ¶ 27; Exhibit B, pp. 91-97.

On October 6, 2009, an orthopedic surgeon diagnosed Dixon with a right lower extremity peripheral neuropathy[5] from the gunshot wound, recommended a neurology consultation, and noted that he would examine Dixon again in six weeks. Exhibit A. ¶ 28. Dixon was transferred to the Maryland Reception, Diagnostic and Classification Center before the neurology consultation was scheduled.

In early March of 2010, Dixon was transferred to the Maryland Correctional Institution-Jessup. On March 5, 2010, Melaku Ayalew, M.D. requested a surgical consultation for Dixon to evaluate the necessity of removing the bullet from his hip. Exhibit A, ¶ 29.[6]

**II.     Standard of Review**

Fed.R.Civ.P. 56(c) provides that summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[4] The acetabulum is a deep socket on the outer surface of the pelvis into which the head of the femur (thigh bone) fits, forming the hip joint. ECF No. 8, Exhibit A, n 5.

[5] Peripheral neuropathy is damage to the peripheral nervous system and can cause temporary numbness, tingling, and pricking sensations, sensitivity to touch, or muscle weakness. ECF No. 10, Exhibit A, no. 7.

[6] The record does not indicate whether a second surgical consultation ever occurred. Dixon indicates that an x-ray taken at MCI-Jessup showed the bullet fragments. Plaintiff's Reply, ECF No.10.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in [the nonmovant's] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Medical Center, Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III. Discussion

#### 1. Respondeat Superior

Defendant CMS is a private corporation that contracts with the State of Maryland to provide medical services to inmates at certain state institutions. CMS administers medical care only through its agents and employees. To the extent the Complaint names CMS solely upon vicarious liability, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat

superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

### 2. Eighth Amendment Claim

Even were this matter to proceed to review, verified medical records filed by counsel on behalf of CMS fail to suggest a violation of constitutional magnitude. In order to state a constitutional claim for denial of medical care, Dixon must demonstrate that the Defendant's acts (or failures to act) amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97,106 (1976). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). Defendant must know of and disregard an excessive risk to inmate health or safety. "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *See Miltier v. Born,* 896 F.2d 848 (1990).

The record shows that Dixon was evaluated and treated for his hypertension, digestive, and bowel concerns. He was twice tested for the presence of blood in his urine and both tests yielded negative results. For his leg and hip pain from a prior gunshot wound, he was provided assistive devices, medication, x-rays, and an orthopedic consultation with a second ordered. While Dixon might dispute the course of treatment or the alacrity by which specialty consultations were provided, the record shows that he was monitored, evaluated, and treated for his medical concerns. Dixon's allegations, taken as true, neither establish that medical providers acted with deliberate indifference to his serious medical needs nor that the treatment provided was so grossly incompetent or inadequate as to amount to a violation of constitutional dimension.

## IV. Conclusion

For the reasons stated, the Court will grant defendant's Motion for Summary Judgment and enter judgment in favor of defendant. A separate order follows.

Date: December 28, 2010

                                                                          /s/
                                                Alexander Williams, Jr.
                                                United States District Judge